UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ADRIANNE ALLEN, et al.,                            :

                           Plaintiffs,             :        03 Civ. 2829 (KMW) (GWG)

          -v.-                                     :        **REPORT AND**
                                                            **RECOMMENDATION**

CITY OF NEW YORK, et al.,                          :

                           Defendants.             :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**


APPEARANCES OF COUNSEL:


For Plaintiffs:

          Daniel M. Perez
          Kuby & Perez
          119 West 23rd Street, Suite 900
          New York, NY 10011

              - and -

          Scott A. Korenbaum
          111 Broadway, Suite 1305
          New York, NY 10006

For Defendants:

          Mark Zuckerman
          Pamela Lynam Mahon
          Susan M. Halatyn
          Office of Corporation Counsel
          100 Church Street
          New York, NY 10007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ADRIANNE ALLEN, et al.,                                :

                          Plaintiffs,                    :            03 Civ. 2829 (KMW) (GWG)

       -v.-                                              :            **REPORT AND
                                      RECOMMENDATION**

CITY OF NEW YORK, et al.,                              :

                         Defendants.                   :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs are sixteen individuals who were arrested on Third Avenue in Manhattan in

February 2002 while engaging in an "Earth and Animal Liberation March" during the World

Economic Forum ("WEF").  They brought this action against the City of New York and various

individual defendants alleging false arrest, malicious prosecution, first amendment retaliation,

excessive post-arrest detention, and other claims arising out of their arrests.  The defendants have

moved for summary judgment and the plaintiffs have cross-moved for partial summary

judgment.  For the reasons stated below, the defendants' motion should be granted in part and

denied in part, and the plaintiffs' motion should be denied.

I. <u>BACKGROUND</u>

     A. <u>Facts</u>

      The following facts, taken largely from the parties' statements pursuant to Local Civil

Rule 56.1, are undisputed unless otherwise noted.[1]

---

     [1]<u>See</u> Defendants' Local Rule 56.1 Statement of Undisputed Facts, dated Nov. 22, 2005
("Def. 56.1") (attached to Notice of Motion, dated Nov. 22, 2005, and filed May 19, 2006
(Docket #144) ("Def. Mot.")); Plaintiffs' Combined Local Civil Rule 56.1 Statement in
Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-
Motion for Partial Summary Judgment, dated Feb. 17, 2006  ("Pl. 56.1") (attached to Plaintiffs'

1.  <u>The March and the Arrests</u>

In the late afternoon of Sunday, February 3, 2002, the fourth day of the WEF meetings in New York City, plaintiffs gathered, along with 100 to 200 other individuals, at Fifth Avenue and 76th Street in Manhattan to participate in the "Earth and Animal Liberation March."  <u>See</u> Def. 56.1 ¶ 1; Pl. 56.1 ¶¶ 1, 81, 82; Def. 56.1 Reply ¶ 1.  No permit had been obtained for the march. <u>See</u> Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.  Approximately 100 police officers were present at Fifth Avenue and 76th Street to accompany the march.  <u>See</u> Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.

Shortly after the march began, plaintiffs and the other demonstrators stopped in front of the Siena, a residential building near Third Avenue and 76th Street.  <u>See</u> Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13.  After one demonstrator gave a speech, another demonstrator broke one of the Siena's front glass doors with a hammer, and red paint was thrown near the entranceway.  <u>See</u> Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.  After this incident, the police established a "frozen zone," preventing the marchers from moving.  <u>See</u> Pl. 56.1 ¶ 15; Deposition of Terrence Monahan, dated Oct. 6, 2004 (reproduced as Ex. 1 to Pl. Opp.) ("Pl. Monahan Dep."), at 97-98.  Defendant Terence Monahan, a police chief, then announced over a bullhorn, "You are blocking the flow of pedestrian traffic. If you do not leave, you will be arrested.  If you do not leave, you will be arrested for blocking the sidewalk."  <u>See</u> Pl. 56.1 ¶ 15; Def. 56.1 ¶ 15.

After approximately 5 to 10 minutes, the police directed some demonstrators to leave to the east and others to the west.  <u>See</u> Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.  The parties disagree as to the

_____

Cross-Motion and Notice of Cross-Motion for Partial Summary Judgment, dated Feb. 17, 2006, filed unsealed Mar. 16, 2006 (Docket #132) ("Pl. Opp.")); Defendants' Local Rule 56.1 Statement in Further Support of Summary Judgment and Opposition to Plaintiffs' Motion, filed Apr. 17, 2006 (Docket #138) ("Def. 56.1 Reply").

purpose of this split: plaintiffs cite to defendant Thomas Lawrence's testimony to contend that it was done in order "for [the marchers] to continue a march peacefully," <u>see</u> Pl. 56.1 ¶ 17 (quoting Deposition of Thomas Lawrence, dated Sept. 22, 2004 (reproduced as Ex. 2 to Pl. Opp.), at 202-03), while defendants cite to a different portion of the same testimony to contend that it was done "in order to ensure that the march did not continue and that the demonstrators dispersed," <u>see</u> Def. 56.1 ¶ 17 (citing Deposition of Thomas Lawrence, dated Sept. 22, 2004 (reproduced as Ex. R to Def. Mot.), at 140-41); <u>see also</u> Def. 56.1 ¶ 17 (citing Deposition of Terrence Monahan, dated Oct. 6, 2004 (reproduced as Ex. S to Def. Mot.), at 185) (purpose of split was "[t]o prevent the march from re-forming").

Following the split, plaintiffs and other demonstrators regrouped and continued to march south on Third Avenue.  <u>See</u> Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.  At 71st Street, this group of marchers split on their own into two groups: one group proceeded east and then turned south on Second Avenue, while the other group, which included all plaintiffs, continued south on Third Avenue. <u>See</u> Pl. 56.1 ¶ 104; Def. 56.1 Reply ¶ 104.  As this latter group marched on the sidewalk, Monahan issued the following orders at least 20 times over a bullhorn: "You're blocking the flow of pedestrian traffic.  If you do not move, you will be arrested.  Walk one or two abreast; if you do not walk one or two abreast, you will be arrested."  The marchers were also ordered initially to "move to your right," and subsequently to "move to your left."  <u>See</u> Def. 56.1 ¶ 23; Pl. 56.1 ¶¶ 23, 107.  The plaintiffs contend that it was difficult or impossible to follow this last order because of objects situated on the left side of the sidewalk, such as planters, trees, garbage cans, telephones, and newspaper stands.  <u>See</u> Pl. 56.1 ¶ 107.

3

With regard to this portion of the march, the parties dispute: (1) whether plaintiffs attempted to comply or could have complies with the order; (2) to what degree, if any, they blocked the sidewalks as they marched south on Third Avenue; and (3) whether pedestrians were forced to walk in the street as a result of the march.  See Def. 56.1 ¶¶ 24, 27; Pl. 56.1 ¶¶ 24, 27, 115-23, 126; Def. 56.1 Reply ¶¶ 33, 115-23, 126.

At the intersection of Third Avenue and 60th Street, plaintiffs and the other demonstrators were stopped by police officers and physically blocked from continuing.  See Pl. 56.1 ¶ 30.  Monahan said, "Stop!" and "Stop here."  See id.  He then repeated his order that the demonstrators were blocking pedestrian traffic, that they needed to move to the left "one or two abreast," and that "[i]f you do not move, you will be arrested."  See id.; Def. 56.1 ¶ 30.  The parties disagree as to whether plaintiffs and the other demonstrators were provided a means to leave at this point.  Plaintiffs contend they were "surrounded by police officers."  See Pl. 56.1 ¶¶ 30, 138.  Defendants contend that marchers were free to leave to the east, west, or north.  See Def. 56.1 Reply ¶¶ 31, 138.

The police began to arrest plaintiffs and the other demonstrators, although the parties disagree as to how much time passed between Monahan's last order and the beginning of the arrests.  See Def. 56.1 ¶ 31 (approximately "two minute gap"); Pl. 56.1 ¶ 31 ("thirty-four seconds").  The decision to arrest the marchers was made jointly by Monahan, Lawrence, and Jack McManus.  See Pl. 56.1 ¶ 89; Def. 56.1 Reply ¶ 89.  When demonstrators asked why they were being arrested, Monahan replied, "You were walking more than two abreast."  See Pl. 56.1 ¶ 154.

2.  The Post-Arrest Detention

All the plaintiffs were transported to the Brooklyn Navy Yard for arrest processing, and the female plaintiffs were subsequently transported to another location, Brooklyn Central Booking.  See Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35.  The New York Police Department ("NYPD") had previously selected these two sites so that they could process the large number of arrests that were anticipated during the WEF.  See Def. 56.1 ¶¶ 36, 38.  These sites were available for processing WEF arrestees 24 hours a day.  See Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39.  A "T-1 line" was installed at the Brooklyn Navy Yard to allow for a "live scan" machine and the taking of arrestees' fingerprints.  At Brooklyn Central Booking, two computer terminals with assigned operators were set aside, as well as a mobile arrest unit with additional terminals and assigned staff, to expedite the arrest processing at that location.  See Def. 56.1 ¶¶ 41, 44; Pl. 56.1 ¶¶ 41, 44.  Training had been provided to the NYPD personnel who were assigned to conduct arrest processing at both sites.  See Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.

While the City has a goal of arraigning all arrestees within 24 hours, the time between plaintiffs' arrest and their arraignment averaged 36.17 hours.  See Pl. 56.1 ¶¶ 45, 180.  The average arrest-to-arraignment time for all WEF arrestees was 34.65 hours, while for non-WEF arrestees arrested during the same period it was 19.79 hours.  Pl. 56.1 ¶¶ 45, 211-213.

3.  Charges and Dispositions

Plaintiffs were charged with disorderly conduct, obstruction of governmental administration, and parading without a permit.  See Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50.  Following their release, most plaintiffs accepted Adjournments in Contemplation of Dismissal, see New York Penal Law § 170.55, as a disposition of the criminal charges against them.  See Def. 56.1

5

¶ 52; Pl. 56.1 ¶ 52.  One case was dismissed in the interest of justice and three others were

dismissed on speedy trial grounds.  See Def. 56.1 ¶ 53; Pl. 56.1 ¶¶ 53, 254-56; Def. 56.1 Reply

¶¶ 254-56.  Another case was dismissed on the ground that the People could not prove it beyond

a reasonable doubt.  See Pl. 56.1 ¶ 258; Def. 56.1 Reply ¶ 258.

B. Procedural History

Plaintiffs filed this action on April 23, 2003.  See Complaint, filed Apr. 23, 2003 (Docket

#1); see also Third Amended Complaint, filed Aug. 2, 2005 (Docket #112) ("Third Am.

Compl.").  Plaintiffs raised claims under the federal Constitution of false arrest, see Third Am.

Compl. ¶¶ 252-54; deprivation of free speech and expression based on the claim that the arrests

were retaliatory, see id. ¶¶ 255-58; malicious prosecution, see id. ¶¶ 259-61; excessive force, see

id. ¶¶ 262-64; municipal liability based on the allegedly excessive detentions following

plaintiffs' arrests, see id. ¶¶ 265-92, 293-95; and "failure to supervise" based on the excessive

detention claim, see id. ¶¶ 296-98.  They also raised claims under New York State law of

malicious prosecution, see id. ¶¶ 299-301; false arrest and imprisonment, see id. ¶¶ 302-04; and

assault and battery, see id. ¶¶ 305-07.  Plaintiffs subsequently withdrew the claims of federal

excessive force; federal municipal liability against Monahan, Lawrence, McManus, and Spadaro;

state malicious prosecution; and the remaining state claims of certain plaintiffs.  See Declaration

of Daniel M. Perez, dated Feb. 17, 2006 (attached to Pl. Opp.) ("Perez Decl."), ¶ 9.

The defendants have filed the instant motion for summary judgment seeking dismissal of

the case in its entirety.  See Def. Mot.; Defendants' Memorandum of Law in Support of

Summary Judgment, dated Nov. 22, 2005, and filed May 19, 2006 (Docket #145) ("Def.

Mem."); Def. 56.1.  Plaintiffs filed papers opposing defendants' motion for summary judgment

and cross-moved for partial summary judgment on two issues: (1) that there was no probable cause to arrest plaintiffs, and (2) that certain defendants and the City of New York excessively detained plaintiffs in violation of the Fourth Amendment.  See Pl. Opp. at 1; Pl. 56.1; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment, dated Feb. 17, 2006, filed unsealed Mar. 16, 2006 (Docket #133) ("Pl. Mem.").  Both sides filed additional papers.  See Defendants' Memorandum of Law in Further Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion, filed Apr. 17, 2006 (Docket #136) ("Def. Reply Mem."); Def. 56.1 Reply; Reply Declaration of Daniel M. Perez, filed May 15, 2006 (Docket #141).

## II.  DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144,

7

158-59 (1970)); <u>Brosseau v. Haugen</u>, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>,'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993) (quoting <u>Celotex</u>, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing <u>Anderson</u>, 477 U.S. at 247-48).

    B. <u>Federal False Arrest Claim</u>

        Plaintiffs contend that defendants arrested them without probable cause. <u>See</u> Third Am. Compl. ¶¶ 252-54.

        1. <u>Law Governing False Arrest Claims</u>

        The elements of a false arrest claim under 42 U.S.C. § 1983 are substantially the same as the elements under New York law. <u>See</u> <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996). A

claim for false arrest under New York law requires a plaintiff to show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)).  The "existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'"  See Weyant, 101 F.3d at 852.  Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Id.; accord Gerstein v. Pugh, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (citation and internal quotation marks omitted); Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991), cert. denied, 505 U.S. 1221 (1992); Dorman v. Castro, 347 F.3d 409, 412 (2d Cir. 2003); Shain v. Ellison, 273 F.3d 56, 67-68 (2d Cir. 2001); Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).  In evaluating these matters, the court should "consider the facts available to the officer at the time of the arrest."  Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).  The existence of probable cause must be determined based on the totality of the circumstances, see Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989), and evaluated under an "objective standard," United States v. Tramontana, 460 F.2d 464, 467 (2d Cir.1972); Bulanov v. Town of Lumberland Constable Meehan, 2002 WL 181365, at *4 (S.D.N.Y. Feb. 6, 2002).  It is an open question in the Second Circuit as to whether the defendant

9

bears the burden of establishing the existence of probable cause or whether the plaintiff bears the burden of establishing its absence.  See Davis v. Rodriguez, 364 F.3d 424, 434 n.8 (2d Cir. 2004).  Finally, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers."  Weyant, 101 F.3d at 852; accord Bulanov, 2002 WL 181365, at *4.

Notably, it does not matter whether a particular charge on which a defendant relies to justify the arrest was one with which a plaintiff was originally charged.  See Devenpeck v. Alford, 543 U.S. 146, 153-54 (2004) (probable cause to arrest can exist even if offense relied upon is not even "closely related" to offense charged); Jaegly v. Couch, 439 F.3d 149, 150 (2d Cir. 2006) ("a claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime").

 The City relies on two portions of the Disorderly Conduct statute, New York Penal Law § 240.20, as the basis for the arrests and on a provision of the Administrative Code of the City of New York ("Administrative Code") that bars parading without a permit.  Because the individual defendants must be granted summary judgment based on their invocation of the Administrative Code provision, it is unnecessary to reach the other two bases for arrest.  See Jaegly, 439 F.3d at 154 (in a false arrest case, "it is not relevant whether probable cause existed with respect to each individual charge").

### 2.  Section 10-110 of the Administrative Code

Section 10-110(a) of the Administrative Code states: "A procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner." Section 10-110(c) provides that "[e]very person

participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment." Section 19-02 of Title 38 of the Rules & Regulations of the City of New York ("NYCRR") defines a "parade or procession" as "any march, motorcade, caravan, promenade, foot or bicycle race, or similar event of any kind, upon any public street or roadway." See 38 NYCRR § 19-02.

a. Applicability of the Statutory Text. Here, it is undisputed by plaintiffs that they were part of a "march." E.g., Pl. 56.1 ¶¶ 5, 7, 21, 24, 81. The march was "organized," had a "leader," and had been previously "scheduled." Id. Indeed, it was publicized in, among other places, the New York Times as the "Earth and Animal Liberation March," where it was listed as "[a] march . . . starting at 76th Street and 5th Avenue." Id. There was no permit, however, to conduct this march. Id. ¶ 6.

At its beginning, the march had between 100 and 200 participants. Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1. At the time of the arrests, there were approximately 60 to 70 marchers in the Third Avenue group. Pl. 56.1 ¶ 108. Some marchers carried signs with writing or photographs on them. Id. ¶ 84. Many of the marchers "chanted." Id. ¶ 84. The participants were marching on the sidewalk throughout the march. Id. ¶ 90. They were walking sufficiently close together that "[w]hen the march slowed, it compressed, causing the marchers to bunch up." Id. ¶ 131. The march moved at the rate of one block every minute and a half to two minutes. Id. ¶ 133. The only time the march stopped was when the police ordered the marchers to stop. Id. ¶ 132. The

11

sixteen plaintiffs in this case "never stopped 'moving' or 'traveling' unless they were ordered to do so by the police or in deference to a 'Don't Walk' sign." Id. ¶ 132.

Based on these facts, a reasonable officer could conclude that this group constituted a "procession"– particularly given that NYCRR 19-02 defines a procession to include a "march." Inasmuch as section 10-110 requires a permit for any procession in any "public place" – a term that indisputably includes sidewalks – and the marchers did not have a permit, the text of section 10-110 provided probable cause to justify the arrest of the plaintiffs.

Plaintiffs' primary argument that there was no probable cause to arrest them rests on their contention that the police department regulations limit the scope of the Administrative Code's text. Those regulations define a "parade or procession" as a "march . . . upon any public street or roadway." See 38 NYCRR § 19-02. Plaintiffs argue that because they were on a sidewalk, they do not come within the terms "public street or roadway" and thus there was no probable cause to arrest them. See Pl. Mem. at 36.

We need not answer the question of whether the validity of an arrest for purposes of a constitutional false arrest claim could turn on the applicability of administrative regulations in a case where the plain text of an enactment permits arrest. Rather, plaintiffs argument fails because the term "street" potentially includes a sidewalk. While some dictionary definitions of "street" exclude sidewalks, one dictionary definition specifically defines "street" as "a thoroughfare . . . that is wider than an alley or lane and that usu. includes sidewalks." See Merriam-Webster's Collegiate Dictionary 1160 (10th ed. 2000) (emphasis added). None of the cases cited by plaintiff construing section 110-10 or its regulations, see Pl. Mem. at 36, contain

any rulings on the question of whether the term "public street" in section 10-110 includes a sidewalk.[2]

In sum, while plaintiffs may be correct that the term "street" should not be read to include sidewalks and that a court might one day definitively so rule, a reasonable police officer would be equally justified in concluding that a court might definitively rule otherwise.

b. Judicial Estoppel.  Before discussing the effect of the ambiguity of section 10-110 on plaintiffs' claims of false arrest, we first address the contention that the defendants are "judicially estopped" from arguing that a permit is required for a "demonstration on a non-Parks department sidewalk."  Pl. Mem. at 36.  The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  Pegram v. Herdrich, 530 U.S. 211, 227, n.8 (2000); accord New Hampshire v. Maine, 532 U.S. 742, 749 (2001).

> [S]everal factors typically inform the decision whether to apply the doctrine in a particular case:  First, a party's later position must be clearly inconsistent with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. . . .  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire, 532 U.S. at 750-751 (citations and internal quotation marks omitted).

---

[2]Moreover, a separate portion of the police department's regulations lends support to the view that the term "public street" includes sidewalks. 38 NYCRR Ch. 19 n.1 provides that "[t]he Police Department is authorized to regulate, direct and restrict the movement of pedestrians and vehicular traffic to facilitate and to prevent the obstruction of the free passage on the public streets and to disperse unlawful assemblages." (emphasis added).  In this formulation, the term "public streets" specifically refers to the movement of "pedestrians," suggesting that sidewalks may be included in the term "public streets."

The Second Circuit has held that, in order for judicial estoppel to be invoked, "(1) the party against whom it is asserted must have advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position must have been adopted by the court in some matter." Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006); accord Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148 (2d Cir. 2005) (citing Stichting v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005)); Bates v. Long Island R.R. Co., 997 F.2d 1028, 1038 (2d Cir.), cert. denied, 510 U.S. 992 (1993). Moreover, the Second Circuit has limited the doctrine of judicial estoppel "to situations where the risk of inconsistent results with its impact on judicial integrity is certain." Simon v. Safelite Glass Corp., 128 F.3d 68, 72 (2d Cir. 1997); accord Uzdavines, 418 F.3d at 148. Because the inquiry is inherently case-specific, "[t]he circumstances under which the doctrine could be applied are far from clear." Young v. U.S. Dep't of Justice, 882 F.2d 633, 639 (2d Cir. 1989).

Plaintiffs assert that in a case entitled Metropolitan Council v. Safir, 00 Civ. 4254 (KMW) (S.D.N.Y. filed June 8, 2000), the "defendants and their counsel" acknowledged that no permit is required for a "demonstration on a non-Parks department sidewalk," Pl. Mem. at 36, and that they are thus barred from arguing the applicability of Section 10-110 to plaintiffs in this case.

This argument fails because the demonstration at issue in Metropolitan Council was a stationary sidewalk demonstration – not a parade, procession or march. See Metropolitan Council, Inc. v. Safir, 99 F. Supp. 2d 438, 440 (S.D.N.Y. 2000). Thus, the City's attorney stated to the Metropolitan Council court only that "[n]o permit is required to conduct a demonstration on a non-Parks Department sidewalk," see Letter from Daniel S. Connolly to Hon. Kimba M.

Wood, dated June 8, 2000 (reproduced in Ex. 19 to Pl. Opp.), at 2 (emphasis added) – referring

to the stationary demonstration at issue in that case, not to a march.  Notably, in complete

conformity with the City's position in this case, the attorney in Metropolitan Council added that

the City regulates "parades on a street or sidewalk," citing Section 10-110.  Id. (emphasis

added).[3]  The doctrine of judicial estoppel is inapplicable because it requires that there be "a true

inconsistency between the statements in the two proceedings."  Simon, 128 F.3d at 72-73.  "If

the statements can be reconciled there is no occasion to apply an estoppel."  Id. at 73.  Here,

there is no inconsistency.

Because of the doctrine's inapplicability, it is unnecessary to reach the question of

whether any of the individual defendants in this case could be estopped at all based on

statements made by other individuals were who were defendants in a different case.

c.  Admissions of Party-Opponent.  In a footnote, plaintiffs assert that the two statements

in the Metropolitan Council case constitute admissions of a party-opponent under Fed. R. Evid.

801(d)(2)(C) and 801(d)(2)(D).  Pl. Mem. at 38 n.3.  While it is unclear why any of the

individual defendants here could be bound by statements other than those that they themselves

made, once again it is not necessary to reach this question.  Plaintiffs' argument fails more

simply because these statements do not support plaintiffs' contention that probable cause was

---

[3]The other statement in that case cited by plaintiffs, from Inspector Stephen H. Friedland,
essentially tracks the statement of the City attorney.  See Declaration of Stephen H. Friedland in
Opposition to Plaintiff's Application for Injunctive Relief, dated June 9, 2000 (reproduced in Ex.
19 to Pl. Opp.), ¶ 2 ("the Police Department does not issue permits for demonstrations on City
sidewalks . . . . [but will] regulate or restrict uses of the public sidewalks when such use may
interfere with the free flow of pedestrian traffic or may other wise implicate general public safety
concerns").

lacking for their arrest.  Rather, the statements are consistent with the position that the defendants have taken in this case.

d.  Statements of Officers.  The plaintiffs also point to statements from certain of the individual defendants in this and other litigation that plaintiffs contend are inconsistent with the position that Section 10-110 applies to a march on a sidewalk.  Pl. Mem. at 37; see Pl. 56.1 ¶ 90. Because none of the purportedly inconsistent statements has been "adopted by the tribunal to which it was advanced," see Uzdavines, 418 F.3d at 148, plaintiffs cannot invoke the doctrine of judicial estoppel.  Perhaps recognizing this problem, they instead argue only that the purported inconsistencies are "disturbing."  Pl. Mem. at 37.

That plaintiffs characterize the purported inconsistencies as "disturbing" does not constitute a ground for concluding that probable cause was lacking for their arrest.  Thus, it is unclear why they are raising this point.  In any event, the purported inconsistency is more illusory than real.  The statements derive from depositions of the officers in which, in most instances, they were being asked only whether a permit was needed to conduct a sidewalk march and answered that it was not necessary.  See Pl. 56.1 ¶ 90 (citing Deposition of Nicholas Estavillo, dated Oct. 22, 2004 (reproduced as Ex. 4 to Pl. Opp.), at 30-31; Deposition of John B. McManus, dated Dec. 2, 2004 (reproduced as Ex. 3 to Pl. Opp.), at 161; Pl. Monahan Dep. at 46).  These individuals, however, were not asked whether the statutory language of Section 10-110 could be applied to plaintiffs' conduct.  Instead, the answers, read in the context of the questions asked, are most reasonably interpreted as stating only that, as practical matter, the police department has not required a permit for a sidewalk march.  See, e.g., Deposition of Thomas Graham in Gibbons v. City of New York, 99 Civ. 10603, dated May 10, 2000, at 53

16

(reproduced as Ex. 19 to Pl. Opp.) (police department made an "administrative decision" to allow sidewalk marches without a permit).  These statements thus do not defeat the defendants' legal argument on the applicability of Section 10-110 since the mere fact that the police department selectively enforces a particular law does not support a claim that the officers lacked probable cause for the arrest.  See generally United States v. Scopo, 19 F.3d 777, 784 (2d Cir.) (so long as there is probable cause for an arrest, "[i]t is . . . irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop"), cert. denied, 513 U.S. 877 (1994).

To the extent plaintiffs contend that any of these witnesses were being asked to give a binding legal opinion on the applicability of Section 10-110 to the conduct at issue here, and that the witness' answers can be construed as asserting that Section 10-110 does not apply, such an argument still would not permit plaintiffs to prevail.  It is well settled that even an expert witness may not give testimony as to legal conclusions.  See, e.g., Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505, 509-10 (2d Cir.), cert. denied, 434 U.S. 861 (1977).  As the Second Circuit put it, "it is . . . erroneous for a witness to state his opinion on the law of the forum."  Id. at 510; accord Highland Capital Management, L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (citing cases); see also United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (the Second Circuit "requires the exclusion of testimony which states a legal conclusion"); Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.") (citing cases).  Thus, to the extent any of the defendants' statements could be construed as offering an opinion on whether the plaintiffs' conduct violated Section 10-110, those statements are inadmissible and thus

17

cannot defeat the defendants' ability to make a contrary legal argument in the briefing on this motion.

Notably, even if one or more of the arresting officers personally believed, incorrectly, that he lacked probable cause to arrest, that personal belief would be irrelevant to the question of whether there has been a violation of the Fourth Amendment. "[T]he subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 397 (1989); accord Brigham City, Utah v. Stuart, 126 S. Ct. 1943, 1948 (2006). "An officer's evil intentions will not make a Fourth Amendment violation out of . . . objectively reasonable" conduct. Graham, 490 U.S. at 397.

### 3. Qualified Immunity

Defendants have asserted the qualified immunity doctrine as a defense to plaintiffs' false arrest claims. See Def. Mem. at 34.

a. Governing Standard. The doctrine of qualified immunity "extends to official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' insofar as it was objectively reasonable for such officials to believe, even if mistakenly, that their conduct did not violate such rights." See Ricciuti, 124 F.3d at 127-28 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

Where a qualified immunity defense is raised, a court generally makes make a two-fold inquiry. First, the court determines whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right." Saucier

18

v. Katz, 533 U.S. 194, 201 (2001).  Second, assuming such a constitutional right has been violated, the government employee is entitled to qualified immunity "'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'"  Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001)).

"A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'"  Anderson, 317 F.3d at 197 (alterations in original) (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)).  For a right to be clearly established, it is not sufficient for a general constitutional right to have been recognized; rather, the right must be established in "a more particularized . . . sense," Anderson, 483 U.S. at 640 – that is, "in light of the specific context of the case," Saucier, 533 U.S. at 201.  Thus, the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202; see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (the "salient question" is whether the state of the law at the time of the violation gave officers "fair warning").  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  See Saucier, 533 U.S. at 202 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).  On the other hand, to defeat qualified immunity, it is not necessary to show a court decision squarely on point indicating the violation of a constitutional right.  See Anderson, 483 U.S. at 640; accord Papineau v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006) (qualified immunity

19

not available if 'in the light of pre-existing law the unlawfulness is apparent") (internal bracketing and citations omitted).

The right not to be arrested or prosecuted in the absence of probable cause "is a long established constitutional right." Ricciuti, 124 F.3d at 128.  Nonetheless,"[a] police officer is entitled to qualified immunity shielding him or her from a claim for damages for false arrest where (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest." See id. (citation omitted).  Because the qualified immunity doctrine and the probable cause doctrine both involve judgments about reasonableness, "[q]ualified immunity from suit for false arrest is in part . . . a matter of second-order reasonableness: an officer is immune if it was reasonable for him to believe, reasonably, that the plaintiff was breaking the law." Posr v. Court Officer Shield No. 207, 180 F.3d 409, 416 (2d Cir. 1999) (emphasis omitted).

In the false arrest context, "[s]ummary judgment on the basis of qualified immunity is appropriate when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." Ricciuti, 124 F.3d at 128 (citation omitted).  In contrast, defendants are not entitled to summary judgment "if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).

b.  Application of the Doctrine.  In conducting the qualified immunity analysis, a court normally first determines whether a constitutional right has been violated.  See Saucier, 533 U.S. at 201.  The Second Circuit has made clear that such an approach is not mandatory, however,

20

see, e.g., Vives v. City of New York, 405 F.3d 115, 118-19 (2d Cir. 2004), and we do not follow it here inasmuch as following the traditional approach would require a definitive ruling on a question of state law that is the subject of significant dispute.  See Ehrlich v. Town of Glastonbury, 348 F.3d 48, 60 (2d Cir. 2003) (declining to make constitutional ruling in a qualified immunity analysis where the determination turned on an "ambiguous state law" that might be "subject to reversal as a result of subsequent state court rulings").

As previously noted, see Section II.B.2 above, there is a strong – and perhaps even meritorious – argument that Section 10-110 applied to the conduct engaged in by the plaintiffs inasmuch as there is no dispute that they were conducting a march on a public sidewalk.  Thus, a reasonable officer reasonably could have believed that Section 10-110 required a permit for the type of activity in which plaintiffs were engaged and that, because they did not have a permit, they were subject to arrest.  At a minimum, "reasonably competent police officers could disagree as to whether there was probable cause to arrest," Ricciuti, 124 F.3d at 128.  Because this is a case where "the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest," id., the defendants are entitled to qualified immunity.  See, e.g., Sorenson v. Ferrie, 134 F.3d 325, 330 (5th Cir. 1998) (officers entitled to immunity from false arrest claim where statute was ambiguous).  Thus defendants' motion for summary judgment as to that claim must be granted and plaintiffs' cross-motion must be denied.[4]

---

[4]Plaintiffs make no argument that Section 10-110 is facially unconstitutional or unconstitutional as applied in this particular case, let alone that the officers should have known as much.  Nor would a claim as to facial unconstitutionality have any effect on the result.  As the Second Circuit has held,

In addition, because there is no individual officer liability, there can be no municipal liability for this claim.  See, e.g., Escalera v. Lunn, 361 F.3d 737, 749 (2d Cir. 2004).

C.  Malicious Prosecution

A number of plaintiffs have made a claim of malicious prosecution under federal law. See Third Am. Compl. ¶¶ 259-61.  To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) the matter terminated in plaintiff's favor, (3) there was not probable cause to believe the proceeding could succeed, and (4) the proceeding was begun with malice.  See Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003); see also O'Brien v. Alexander, 101 F.3d 1479, 1484 (2d Cir. 1996) (same). The probable cause determination relevant to a malicious prosecution claim differs from that of a false arrest claim only insofar as "the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced . . . , not the time of the preceding warrantless arrest." See Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000); see also Davis v. City of New York, 373 F. Supp. 2d 322, 329 (S.D.N.Y. 2005).  The standard for qualified

---

> absent contrary direction, state officials . . . are entitled to rely on a presumptively
> valid state statute . . . until and unless [the statute is] declared
> unconstitutional. . . .  The  enactment of a law forecloses speculation by
> enforcement officers concerning [the law's] constitutionality – with the possible
> exception of a law so grossly and flagrantly unconstitutional that any person of
> reasonable prudence would be bound to see its flaws.

Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 102-03 (2d Cir. 2003) (citations, quotation marks, and alterations omitted); accord Vives, 405 F.3d at 117.  Given that there is no controlling authority declaring Section 10-110 facially unconstitutional and there is a split in lower courts on its constitutionality – in decisions issued long after plaintiffs' arrests – only as applied to a particular set of circumstances dissimilar to what occurred in the instant case, compare People v. Bezjak, 11 Misc.3d 424 (Crim. Ct. 2006), with People v. Namer, 11 Misc.3d 409 (Crim. Ct. 2006), the officers here would have acted reasonably in relying on the provision's validity.

immunity from a malicious prosecution claim is the same as that for false arrest: an arresting officer "is entitled to qualified immunity if (a) it was objectively reasonable for the officer to believe that probable cause existed or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  O'Neill v. Town of Babylon, 986 F.2d 646, 649-50 (2d Cir. 1993) (internal citation and quotation marks omitted); accord Joyner v. Morales, 2005 WL 883327, at *4 (S.D.N.Y. Apr. 15, 2005).

Because the defendants here are entitled to immunity from suit based on the existence of probable cause to arrest, so too are they entitled to immunity from suit based on the existence of probable cause to initiate a prosecution against the plaintiffs.  Plaintiffs have pointed to nothing that occurred between the time of the arrest and the disposition of the criminal charges that should have altered the defendants' objectively reasonable belief that the plaintiffs had violated Section 10-110.  Nor have they pointed to any specific conduct on the part of the defendants following the initial arrest that would support a claim for malicious prosecution, such as the giving of false testimony.  See, e.g., White v. Frank, 855 F.2d 956, 962 (2d Cir. 1988).  Thus, defendants' motion for summary judgment should be granted as to this claim as well.

### D. Excessive Detention Claims

Plaintiffs assert that defendants Chief Patrick Devlin, Captain Gary Katz, and Captain Kenneth Kuhn were responsible for excessively detaining plaintiffs in violation of the Fourth Amendment and that the City of New York bears municipal liability for these detentions.  See Third Am. Compl. ¶¶ 265-292, 296-298; Pl. Mem. at 53-67.  We first consider the evidence as to whether plaintiffs were detained excessively in violation of the Fourth Amendment and then consider whether any of the defendants may be held liable for such detention.

1.  Whether Plaintiffs Were Excessively Detained

In Gerstein, 420 U.S. 103, the Supreme Court held that the Fourth Amendment requires

that states must "provide a fair and reliable determination of probable cause as a condition for

any significant pretrial restraint of liberty, and this determination must be made by a judicial

officer either before or promptly after arrest."  Id. at 125 (internal footnotes omitted).  In County

of Riverside v. McLaughlin, 500 U.S. 44 (1991), the Supreme Court held that judicial

determinations of probable cause made within 48 hours of arrest "will, as a general matter,

comply with the promptness requirement of Gerstein."  See id. at 56.  The Court added that

Gerstein may be violated "if the arrested individual can prove that his or her probable cause

determination was delayed unreasonably."  See id.  The Court gave the following examples of

unreasonable delays: "delays for the purpose of gathering additional evidence to justify the

arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."

See id.  The Court added:

> In evaluating whether the delay in a particular case is unreasonable, however,
> courts must allow a substantial degree of flexibility.  Courts cannot ignore the
> often unavoidable delays in transporting arrested persons from one facility to
> another, handling late-night bookings where no magistrate is readily available,
> obtaining the presence of an arresting officer who may be busy processing other
> suspects or securing the premises of an arrest, and other practical realities.

Id. at 56-57.

In other contexts, the Supreme Court has stated more generally that the test for a Fourth

Amendment violation is not based on the subjective motivations of the officers but rather is one

of "objective reasonableness."  See Graham, 490 U.S. at 399; see also Arkansas v. Sullivan, 532

U.S. 769, 772 (2001) (subjective intentions play no role in "ordinary" probable-cause Fourth

Amendment analysis) (citation omitted).  Thus, in one case considering a claim of unnecessarily

prolonged post-arrest attention, the Second Circuit relied on <u>Graham</u> in stating that the "question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  <u>Bryant v. City of New York</u>, 404 F.3d 128, 136 (2d Cir. 2005) (quoting <u>Graham</u>, 490 U.S. at 397) (internal quotation marks omitted); <u>accord id.</u> ("[T]he subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment.")  (quoting <u>Graham</u>, 490 U.S. at 397).  <u>Bryant</u> dealt with the question of whether plaintiffs' rights were violated when the police chose to hold the arrestees in custody until a judge was available to conduct the arraignment rather than issuing them summonses.  <u>Bryant</u>, however, did not discuss the motivations of the defendant police officers – perhaps because the plaintiffs in <u>Bryant</u> did not have evidence of any improper motivation.  Thus, <u>Bryant</u> did not have occasion to apply <u>County of Riverside</u>'s explicit directive that "a delay motivated by ill will against the arrested individual, or delay for delay's sake," 500 U.S. at 56, would constitute sufficient evidence to show a Fourth Amendment violation in a delayed-arraignment claim.

Here, plaintiffs contend that their detention was delayed and that the delay was motivated by ill will and/or was for delay's sake.  <u>See</u> Pl. Mem. at 57-61.[5] Accordingly, we will follow the law as set forth in <u>County of Riverside</u>, as have other courts in this Circuit, to examine the subjective intent of the officers allegedly responsible for the timing of plaintiffs' arraignments.

---

[5]While defendants construe plaintiffs' complaint as seeking to assert a claim only that the City violated its policy of arraigning arrestees within 24 hours, <u>see</u> Def. Mem. at 40, the complaint plainly asserts more generally that the delay constituted a federal constitutional violation.  <u>See</u> Third Am. Compl., ¶¶ 265-92.  This is not to say that the City's 24-hour rule is irrelevant inasmuch as the rule may properly "inform the Court's analysis of whether [any] delay was procedurally necessary." <u>Mahase v. City of New York</u>, 2000 WL 263742, at *4 (E.D.N.Y. Jan. 5, 2000).

See, e.g., Gonzalez v. Bratton, 147 F. Supp. 2d 180, 199 (S.D.N.Y. 2001) (court required jury to determine whether "any excessiveness in [plaintiff's] detention was motivated by [police officer's] ill-will"); id. at 201 (jury could have reasonably determined that the police conduct "could have been intended by [the police officer] to extend [plaintiff's] detention unreasonably"); Mahase, 2000 WL 263742, at *4 (considering whether allegations of the complaint "support an inference that ill will toward [plaintiff] contributed to the delay in releasing her"); cf. Sorensen v. City of New York, 2003 WL 169775, at *4 (S.D.N.Y. Jan. 23, 2003) (plaintiff was entitled to obtain discovery as to whether plaintiff's arraignment was "intentionally" delayed).

Plaintiffs have presented circumstantial evidence that supports the view that they spent more time in detention than was necessary and that the reason for the delay was either "ill will" or "delay for delay's sake." The police department had a policy, issued in conformity with state law requirements, that arrestees would be arraigned within 24 hours of arrest. Pl. 56.1 ¶¶ 180,183, 187-90. The planning for the arrests of any WEF demonstrators, however, did not refer to this 24-hour policy. Id. ¶ 174, 192-196. Certain tools normally used by the police department to determine that the 24-hour policy was being complied with were not used for the WEF protestors. Id. ¶¶ 197-201, 204. The average arrest-to-arraignment time for WEF arrestees was 34.65 hours, while for non-WEF arrestees arrested during the same period it was 19.79 hours. Id. ¶¶ 45, 211-213 (citing Affidavit of Richard Faust, dated Mar. 30, 2005 (reproduced as Ex. 23 to Pl. Opp.)). Any delay could not be attributed to the arrestees' failure to cooperate with police officers, id. ¶¶ 46-47, or to lapses on the part of other agencies involved in the arraignment process, id., ¶¶ 48, 228-32, 244. The City had prepared itself for the processing of

26

many more individuals than were in fact arrested, id., ¶ 174, 181-82, 233, and thus presumably

had the personnel and resources to process the smaller number of detainees expeditiously.  The

WEF arrestees were the subject of unnecessarily harsh comments and treatment, suggesting that

the police wanted to punish them for protesting, id., ¶¶ 249-51.

In sum, this evidence suggests that, while the City routinely tried to conduct itself so that

arraignments occurred within 24 hours, it did not do so with respect to the WEF arrestees – even

though it did so for other arrestees arrested on the same day.  If all reasonable inferences are

accorded to plaintiffs, this evidence – while circumstantial and not conclusive – would allow a

reasonable jury to find that plaintiffs' arraignments were delayed either based on ill will or

merely for the sake of delay.[6]

Plaintiffs cannot be granted summary judgment on this point, however.  The cited

evidence is also susceptible to inferences that could be reasonably be drawn against plaintiffs.

Moreover, the defendants have pointed to other evidence that would support their view that the

defendants were not motivated by ill will or a desire to "delay for delay's sake."  For example,

defendants note that the officers were well aware of the 24-hour rule and thus that there was no

need for it to be specifically mentioned during the planning process, Def. 56.1 Reply ¶¶ 193-95;

that a high-speed internet connection was installed at one of the arrest facilities to facilitate

arrestee processing, Def. 56.1 ¶ 41; that training was provided to personnel conducting the arrest

processing at the arrest facilities, id. ¶ 42; that the defendants in fact made certain reviews of

---

[6]We reject any argument that the mere fact that the protestors were arraigned within 48 hours by itself disposes of their claim of excessive detention.  County of Riverside makes clear that an arraignment is not constitutional permissible merely on the ground that it is provided within 48 hours and that a constitutional violation occurs where the arraignment is "delayed unreasonably."  500 U.S. at 56.

documents in an effort to determine arrestees' processing status and in fact kept track of that status, id. ¶ 43; Def. 56.1 Reply ¶¶ 200-01, 209; that WEF protestors arrested on another date – January 31, 2002 – were arraigned on average within 15.5 hours, Def. 56.1 Reply ¶ 212; and that delays in the arrest-to-arraignment time are explained by a significant failure to cooperate on the part of WEF demonstrators and on other factors, Def. 56.1 ¶¶ 46-48; Def. 56.1 Reply ¶¶ 234-6.

Because there are disputed issues of fact as to why plaintiffs were detained for the periods at issue, neither side may be granted summary judgment on this point.  See Sorensen, 2003 WL 169775, at *3-4 (whether plaintiffs were excessively detained is a matter for the trier of fact because it involves issue of "intent") (citing cases); cf. Vanni v. City of New York, 1988 WL 1956, at *8 (E.D.N.Y. Jan. 5, 1988) (whether delay in arraignment of more than 36 hours was unnecessary was a "question of fact based on all the circumstances and [] therefore not susceptible to summary judgment") (construing  N.Y. Crim. Proc. Law § 140.20); see also DeVito v. Barrant, 2005 WL 2033722, at *6 (E.D.N.Y. Aug. 23, 2005) (allegations of other prisoners being arraigned more quickly is "specific evidence that could support a showing of intent").

### 2.  Defendants' Personal Liability for Excessive Detention

Plaintiffs cannot prevail on their claim simply by showing that they were excessively detained in violation of the Fourth Amendment, however.  Rather, they must identify a defendant legally responsible for that violation.  We next turn to whether the particular defendants sued for this claims – Chief Devlin, Captain Katz, and Captain Kuhn, see Third Am. Compl. ¶¶ 296-98 – may be held personally liable.  As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.'"  Back v.

28

Hastings On Hudson Union Free School Dist., 365 F.3d 107, 127 (2d Cir. 2004) (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)).  But he "can be held liable if he was personally involved in the alleged deprivation."  Id.  A plaintiff may show "personal involvement" by

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Back, 365 F.3d at 127 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).[7]  Plaintiffs at one point assert that they are seeking to hold Chief Devlin, Captain Katz, and Captain Kuhn liable "under a theory of failure to supervise," Pl. Mem. at 60, but then also assert that they should be liable under other categories as well, id. at 61.

Plaintiffs provide a lengthy discussion of the facts they consider material in this matter in their statement under Local Civil Rule 56.1 but they make little effort in their memorandum of law to marshal this evidence specifically as against any of one of the three individual defendants.

---

[7]The City argues that a showing of "deliberate indifference" is always required to show personal involvement based on the fourth-listed basis: inadequate supervision of subordinates. See Def. Mem. at 29-31 (citing Langley v. Coughlin, 715 F. Supp. 522, 545 (S.D.N.Y. 1989)) ("in the wake of [City of Canton v. Harris, 489 U.S. 378, 387 (1989)], it may be the case that inadequate supervision of subordinates is not constitutionally actionable unless it is so egregious as to demonstrate 'deliberate indifference' to defendants' rights")).  The Second Circuit, however, addressed this question in Poe v. Leonard, 282 F.3d 123, 140 & n.14 (2d Cir. 2002), in which it noted that supervisory liability may be shown by "deliberate indifference . . . or . . . gross negligence," and explained that although the terms are sometimes used interchangeably, "they represent different degrees of intentional conduct on a continuum."  Notably, Langley reached its conclusion based on its reading of City of Canton.  But City of Canton addressed municipal liability – not individual supervisory liability.  See 489 U.S. at 388-89.  Thus, while it makes no difference to the outcome of this case, we assume that "gross negligence" is sufficient for purposes of the fourth-listed basis.

Instead, they rely principally on conclusory statements that are devoid of citations to the record. See id. at 61 (Chief Devlin, Captain Katz, and Captain Kuhn "were . . . present at the scene of the excessive detentions; they personally supervised the facilities . . . ; [and t]hey did not correct the wrong once learning of the violation.").  Despite this absence of specificity in the plaintiffs' brief, the Court will consider in greater detail whether any of these three defendants may be shown to have had "personal involvement" in the alleged Fourth Amendment violation.

a.  Chief Devlin.  The following evidence exists with respect to Chief Devlin's personal involvement: (1) Chief Devlin was head of the Criminal Justice Bureau ("CJB"), the unit responsible for arrest processing, and thus had overall responsibility for arrest processing of WEF arrestees, see Pl. 56.1, ¶¶ 179, 180, 184, 185; (2) Chief Devlin knew that arrestees should normally be arraigned within 24 hours, see Pl 56.1, ¶ 185; (3) at a meeting in preparation for the WEF, Chief Devlin did not mention the "24-hour rule," see Pl. 56.1 ¶ 193;  (4) Chief Devlin actually visited the WEF arrest processing facilities, see Pl. 56.1 ¶ 239; (5) Chief Devlin has no recollection of checking the reports used to check the elapsed time since arrest of each arrestee – known as "chronos" – during the WEF, although it was his usual practice to do so, see Pl. 56.1 ¶¶ 197, 204; (6) while Chief Devlin kept detailed information on the arrestees, he did not assign anyone to monitor how long WEF arrestees were being detained, and he assumed the supervisors at the detention centers were checking their chronos, see Pl. 56.1 ¶ 206; (7) Chief Devlin did not recall hearing from anyone in CJB that WEF arrestees were taking longer to arraign than non-WEF arrestees, see Pl. 56.1 ¶ 219, or that he or anyone in the CJB asked how long the NYPD took to arraign WEF arrestees, see Pl. 56.1 ¶ 226; and (8) Chief Devlin was unable to give a

reason for why a particular arrestee might have been detained for more than 40 hours after her arrest, see Pl. 56.1 ¶ 230.

The Court concludes that this evidence – in combination with the evidence discussed earlier regarding the claim that plaintiffs' arraignments were delayed for delay's sake – would be enough for a reasonable jury to find that Officer Devlin had created the "policy or custom" under which the allegedly improper delay occurred; that he was "grossly negligent" in supervising the subordinates who delayed the arraignments; and/or that he "exhibited deliberate indifference" by failing to act when it might have been apparent that the plaintiffs were not being timely arraigned.  Again, such a conclusion would rely entirely on inferences and circumstantial evidence, but for purposes of this motion, such evidence is sufficient to deny Chief Devlin summary judgment.

Summary judgment for plaintiffs is not appropriate, however, in light of the fact that reasonable inferences could be drawn in Chief Devlin's favor as easily as they might be drawn in favor of plaintiffs.  Moreover, Chief Devlin provided explanations for his conduct.  For example, he indicated that he did not discuss the 24-hour goal with his staff because they already knew it, see Def. 56.1 Reply ¶ 194; and that he did not assign someone to make a determination of how long WEF arrestees were being held not because he "did not want to know," but rather because there "are so many variables in the arrest to arraignment times" that it would not be valuable information, see Def. 56.1 ¶ 227.

b.  Captains Katz and Kuhn.  Captains Katz and Kuhn were supervisors at each of the two facilities where the arrestees were taken.  See Pl. 56.1 ¶ 186.  Katz testified specifically that he was responsible for monitoring how long the arrestees had been in custody.  See Deposition of

Gary M. Katz, dated March 15, 2005 (reproduced as Ex. 13 to Pl. Opp.) ("Katz Dep.") at 35.

Both said that it was their regular practice to check the "chronos" during their tours.  Pl. 56.1 ¶

199.  Kuhn testified that he did not do so for the WEF arrestees.  Pl. 56.1 ¶ 200, 209.  Katz states

that he did do so.  Katz Dep. at 35.

While it represents a much closer case, the Court cannot say that, drawing "all justifiable

inferences" in favor of the plaintiffs, a reasonable jury could not conclude that Katz and Devlin

were personally involved in the alleged decision to delay plaintiffs' arraignments merely for the

sake of delay or based on ill will.  As noted in section II.D.1 above, a reasonable jury could use

the circumstantial evidence offered by plaintiffs to conclude that there was no good reason for

the delay in their arraignment.  Katz and Kuhn were the individuals in charge of arrest

processing at the two facilities at which plaintiffs were detained and thus had the means to exert

control over the processing of plaintiffs.  Both stated that they normally checked "chronos"

during their tours.  A jury could would be entitled to make the inference that Kuhn's failure to do

so for the WEF arrestees reflected that he was "grossly negligent in supervising subordinates

who committed the wrongful acts."  Based on Katz's assertion that he normally checked such

chronos, a jury might draw the inference that he was "informed of the violation through a report"

but "failed to remedy the wrong."  Of course, a jury would not be required to draw such

inferences – and would be entitled to find that the delay in arraignments was not improper – and

thus it would be inappropriate to grant summary judgment to plaintiffs on this point.

c.  Qualified Immunity.  As explained previously, the defense of qualified immunity is

available to the extent that the defendants' "conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known."  See Harlow, 457 U.S.

at 818; see also Anderson, 483 U.S. at 638-39 (whether qualified immunity defense applies "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken" (quoting Harlow, 457 U.S. at 818)). Defendants assert qualified immunity as to the charge of excessive detention.  See Def. Mem. at 34-35; Def. Reply Mem. at 37-38.

Here, the rule of County of Riverside – that officers cannot intentionally delay an arraignment for no reason – was "clearly established" at the time of the plaintiffs' arrest and detention.  No reasonable officer could have believed it was permissible to intentionally delay a plaintiff's arraignment based on ill will or delay for delay's sake.  The fact that defendants contest the version of event presented by plaintiffs of course does not entitle them to qualified immunity.  See Curry v. City of Syracuse, 316 F.3d 324, 334 (2d Cir. 2003) ("Where the circumstances are in dispute, and contrasting accounts present [unresolved] factual issues . . . , a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity.") (citations and quotation marks omitted).  Thus, the defendants are not entitled to qualified immunity on this claim.

### 3. Municipal Liability

Plaintiffs seek to hold the City of New York liable for the alleged excessive detention. Municipalities may be treated as "persons" for the purpose of § 1983 claims "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978); accord Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004).  Here, plaintiffs do not assert that the

33

City had a consistent policy of purposely delaying the arraignment of arrestees.  Rather, the claim is that the usual policy of concluding arraignments within 24 hours was "temporarily suspended" for the WEF arrestees," Pl. Mem. at 62, and that the person responsible for instituting the policy of suspending the usual 24-hour goal was Chief Devlin, id. at 62-65.  There is no written document stating that the arraignment of WEF arrestees should be delayed.  But the Supreme Court has recognized that even an unwritten policy may subject a municipality to liability.  As was stated in Pembaur v. City of Cincinnati,

> a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations.  If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.

475 U.S. at 481 (1986).  Where the action is of a final policymaker, a plaintiff does not have "to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability."  Amnesty Am., 361 F.3d at 125; accord Pembaur, 475 U.S. at 480.

To obtain municipal liability however, it is not enough that there be an individual from the municipality who implemented the allegedly unconstitutional "policy."  Rather, the challenged action must have been undertaken by an authorized "final policymaker."  See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) ("only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability").  "[W]hether an official had final policymaking authority is a question of state law."  Pembaur, 475 U.S. at 483; accord Skehan v. Village of Mamaroneck, 465 F.3d 96, 109 (2d Cir. 2006);

34

Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  The policymaking authority may be "granted directly by a legislative enactment or may be delegated by an official who possesses such authority."  Pembaur, 475 U.S. at 483.

Thus, the question before us is whether, under New York State law, Chief Devlin had "final policymaking authority" to implement the purported policy of delaying the arraignment of WEF arrestees.  See, e.g., Capasso v. Metro. Transp. Auth., 198 F. Supp. 2d 452, 464 (S.D.N.Y. 2002) ("the court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action") (citing Jeffes, 208 F.3d at 57).  Plaintiffs have the burden of proof of establishing this point and the court – not a jury – must determine this question as a matter of law.  Jeffes, 208 F.3d at 57-58.

Defendants contend that the Commissioner of the NYPD is the sole "final policymaker" for that department.  See Def. Mem. at 38.  Section 434(b) of the New York City Charter provides that "[t]he commissioner shall be the chief executive officer of the police force.  He shall be chargeable with and responsible for the execution of all laws and the rules and regulations of the department."  For their part, plaintiffs point to no legislative enactment or other provision of state law that makes Chief Devlin the individual with "final policymaking authority" over the treatment of arrestees.  Nor do they point to any delegation by the Police Commissioner to Chief Devlin of the authority to make such policy.  Instead, they point only to evidence that Chief Devlin was the individual within the department who was responsible for supervising arrest processing generally, was the person who wrote the "Processing Protocol" regarding arrest processing procedures for the WEF, and had the authority to make decisions about the procedures used for arrests.  See Declaration of Former Assistant Chief Patrick Devlin,

dated Nov. 22, 2004 (reproduced in Ex. 27 to Pl. Opp.), ¶ 2 ("[a]s Commanding Officer of the

[CJB], I was responsible for the supervision and review of over one million arrests processed in

New York City from October 1999 to July 2004, including the processing of arrests during large

scale events, such as demonstrations. . . .  I was vested with decisionmaking authority with

respect to the procedures in the CJB."); "Overview of Arrest Processing Protocol Regarding the

Upcoming World Economic Summit," dated Jan. 30, 2002 (reproduced as Ex. 25 to Pl. Opp.).

　　　　This showing is insufficient.  That a city official has full responsibility for the operation

of a particular function within a municipality does not mean that he is the "final policymaker"

for that area.  Here, the evidence provided by plaintiffs shows at most only that Chief Devlin was

in charge of the processing of arrestees and thus had "discretion in the exercise of particular

functions." Pembaur, 475 U.S. at 482.  In other words, the evidence shows that Chief Devlin

was responsible for setting up the procedures and supervising the staff that would implement the

department's policy regarding arrest processing and thus that he had authority to do so with

respect to the WEF arrestees.   Pembaur, however, specifically rejected the motion that the

ability to exercise discretion in carrying out municipal functions was sufficient to show that a

municipal official is a policy maker.  475 U.S. at 482-83.  It held, rather, that before the

municipality may be held liable for its employees' acts, the deciding official must be responsible

for "establishing" the final government policy concerning the activity at issue.  Id. at 483

(emphasis added).  Nothing submitted by plaintiffs shows that Chief Devlin had been delegated

such authority by the Commissioner or by any statutory provision.  "It is not automatically the

case that high-level officials in government agencies are responsible for determining the policies

of those agencies."  Magilton v. Tocco, 379 F. Supp. 2d 495, 505 (S.D.N.Y. 2005); see

Praprotnik, 485 U.S. at 128 (high-level city officials lacked final authority to create a retaliatory

personnel policy where that authority was vested under local law in the mayor, alderman, or

Civil Service Commission).  Even a high-level official will not be deemed a policymaker where

the official "remained accountable to department and city policy" in the area in which the

unconstitutional violation is said to have occurred.  Russo v. City of Hartford,  341 F. Supp. 2d

85, 108 (D. Conn. 2004) (police chief not policymaker).

      "'[R]esponsibility for making law or setting policy' – the objective under Praprotnik of

our search through local law – is authority to adopt rules for the conduct of government.

Authority to make a final decision need not imply authority to establish rules."  Auriemma v.

Rice, 957 F.2d 397, 401 (7th Cir. 1992) (emphasis added).  The mere fact that Chief Devlin had

supervisory authority and decisionmaking authority over the arrest process does not mean that

the Commissioner had authorized him to make policy in this area.  As the Seventh Circuit put it:

> Any city acts exclusively through agents; the city is just a name for a complex of
> persons.  If it were enough to point to the agent whose act was the final one in a
> particular case, we would have vicarious liability.  Action in the course of one's
> duty is the basis of vicarious liability.  That a particular agent is the apex of a
> bureaucracy makes the decision "final" but does not forge a link between
> "finality" and "policy". . . .  [Monell] is not to be sabotaged by calling the chief
> bureaucrat who signs off on a particular action the city's "policymaker" for that
> action.

Id. at 400 (citations omitted).

      It is thus not surprising that, in cases where municipal liability has been found based on

the actions of a "policymaker," the policymaker typically was an individual at the apex of a

municipal department  – not a subordinate to such an individual.  See, e.g., Gronowski v.

Spencer, 424 F.3d 285, 293-94 (2d Cir. 2005) (mayor); Mandell v. County of Suffolk, 316 F.3d

368, 385 (2d Cir. 2003) (county police commissioner); Jeffes, 208 F.3d at 61 (county sheriff);

Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 143 (2d Cir. 1999)

(president/general manager and chairman of public benefit corporation); Gashi v. County of

Westchester, 2005 WL 195517, at *13 (S.D.N.Y. Jan. 27, 2005) (commissioner of county jail).

Conversely, where courts have found the individual at issue not be a policymaker, the individual

was commonly a subordinate official, even if a high-level one.  See, e.g., Gernetzke v. Kenosha

Unified School Dist. No. 1, 274 F.3d 464, 469 (7th Cir. 2001) (school superintendent and

principal), cert. denied, 535 U.S. 1017 (2002); Barth v. Village of Mokena, 2006 WL 862673, at

*25 (N.D. Ill. Mar. 31, 2006) (Board of Fire and Police Commissioners); Frobel v. County of

Broome, 419 F. Supp. 2d 212, 223 (N.D.N.Y. 2005) (undersheriff); Russo v. City of Hartford,

341 F. Supp. 2d 85, 108 (D. Conn. 2004) (police chief).

Here, the Police Commissioner is the only individual who could be found, based on the

record before the Court, to be the "policymaker" with respect to how WEF arrestees should have

been treated.  The plaintiffs, however, have provided no evidence of any conduct by the Police

Commissioner that would permit the City to be held responsible for the alleged constitutional

violation – either, for example, because the Police Commissioner acted with deliberate

indifference in failing to train or supervise his subordinates, see, e.g., Anthony v. City of New

York, 339 F.3d 129, 140 (2d Cir. 2003), or because the Police Commissioner himself directed

that the processing of WEF arrestees be delayed, see, e.g., Jeffes, 208 F.3d at 57.  Nor have the

plaintiffs even attempted to make this argument.  Accordingly, the defendants' motion for

summary judgment in favor of the City on the excessive detention claim must be granted.

E. <u>First Amendment Retaliation</u>

In their Second Claim, plaintiffs alleged that certain individual defendants are liable for violating their First Amendment rights by "falsely arresting and imprisoning plaintiffs, or in causing their arrests, in maliciously prosecuting plaintiffs, and in falsely swearing to criminal court complaints." Third Am. Compl. ¶ 256.   In order to prove a claim of First Amendment retaliation, a plaintiff must show the following elements:

> (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.

<u>Curley v. Village of Suffern</u>, 268 F.3d 65, 73 (2d Cir. 2001) (citing <u>Connell v. Signoracci</u>, 153 F.3d 74, 79 (2d Cir. 1998)).

The Second Circuit has held, however, that no First Amendment retaliation claim based on an arrest and/or criminal prosecution is available where the prosecution at issue was supported by probable cause, <u>Mozzochi v. Borden</u>, 959 F.2d 1174, 1179-80 (2d Cir. 1992).  As <u>Mozzochi</u> put it: "[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government." <u>Id.</u> at 1180.  This rule is in accord with case law holding that a pretextual arrest will not invalidate an otherwise lawful search.  <u>See</u>, <u>e.g.</u>, <u>Scopo</u>, 19 F.3d at 784; <u>see also</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (rejecting argument that "the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved").  The Supreme Court recently adopted a rule consistent with <u>Mozzochi</u> in a First Amendment retaliation case.  <u>See</u> <u>Hartman v. Moore</u>, 126 S. Ct. 1695, 1707 (2006) ("Because showing an absence of probable cause will have high probative

force, and can be made mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven."). Because the defendants here are entitled to qualified immunity on the issue of probable cause for the arrest and prosecution of the plaintiffs, it follows that their legal justification for arresting and prosecuting plaintiffs entitles them to qualified immunity from a First Amendment claim. See Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995) ("if the officer either had probable cause or was qualifiedly immune from subsequent suit (due to an objectively reasonable belief that he had probable cause), then we will not examine the officer's underlying motive in arresting and charging the plaintiff").  Accordingly, defendants are entitled to summary judgment on plaintiffs' First Amendment claims based on their arrest and prosecution.

Both parties seem to assume that plaintiffs have also raised a First Amendment retaliation claim based on their excessive detention.  See Def. Mem. at 25; Pl. Mem. at 71.  The plaintiffs' complaint suggests otherwise, however, inasmuch as the factual allegations supporting their First Amendment retaliation claim relate exclusively to assertions that there was no probable cause to arrest or prosecute them – that is, not to any claims that their arraignments were deliberately delayed.  See Third Am. Compl. ¶¶ 256-58.[8]  None of the defendants listed in the portion of the complaint alleging plaintiffs' First Amendment claim, id., has been shown to have had any involvement in the timing of plaintiffs' arraignments.  While the Court does not believe that plaintiffs have pleaded a claim for First Amendment retaliation based on their excessive detention, it will address this claim nonetheless since defendants have done so without objection.

---

[8]The allegations supporting the delay-in-arraignment claims appear later in the complaint. See Third Am. Compl. ¶¶ 266-92.

Plaintiffs' claim that their excessive detention was a result of First Amendment retaliation fails because, with respect to the second element of the <u>Curley</u> test, the plaintiffs have offered no evidence that any particular individual defendant both (1) was motivated to delay plaintiffs' arraignment unnecessarily because of the plaintiffs' exercise of their First Amendment right and (2) actually had responsibility for delaying plaintiffs' arraignment.  Notably, plaintiffs' argument on this point consists of a single sentence, <u>see</u> Pl. Mem. at 71, that refers the Court to portions of their papers that either do not address the First Amendment claim directly or consist of factual allegations devoid of legal argument.  Defendants pointed out this failing in their reply brief.  <u>See</u> Def. Reply Mem. at 29.  Yet plaintiffs made no attempt to rectify it in their own sur-reply papers.

In the one relevant sentence of their brief, plaintiffs assert that the evidence of improper motivation for their arrests may be found in certain paragraphs of their Rule 56.1 Statement as well as a section of their memorandum of law that does not discuss First Amendment retaliation. <u>See</u> Pl. Mem. at 71. The evidence provided of improper motivation is that the NYPD stated it was engaging in a "proactive arrest policy" in order to "set a 'tone' with the demonstrators and their possible plans at other demonstrations," <u>see</u> Pl. 56.1 ¶ 76 (citing Critique of World Economic Forum, by Capt. Robert L. Bonifati, dated Feb. 8, 2002 (reproduced in Ex. 20 to Pl. Opp.); After Action Report on World Economic Forum Meetings and Demonstrations, by Inspector Thomas Graham, dated Mar. 4, 2002 (reproduced in Ex. 20 to Pl. Opp.) ("Graham Report")); that the NYPD "purposely staged massive amounts of police personnel and equipment around the WEF to 'cause them [protestors] to be alarmed,'" <u>see</u> Pl. 56.1 ¶ 77 (citing Critique of World Economic Forum Detail, by Deputy Inspector Michael E. Shortell, dated Feb. 8, 2002

(reproduced in Ex. 20 to Pl. Opp.)) (alteration in original); that the NYPD gathered large amounts of intelligence on the protestors prior to and during the WEF, including covert surveillance of demonstrators, monitoring of demonstrators' websites, listening in on demonstrators' radio transmissions, and interrogating demonstrators after their arrest concerning their group affiliations, their demonstration histories and political beliefs, and political and activist groups' plans during the WEF, see Pl. 56.1 ¶ 78; that the NYPD created a "detailed computerized database of all WEF demonstrators' names, addresses and dates of birth" and distributed it throughout the department, Pl. 56.1 ¶ 79; and that Inspector Graham recommended that in future demonstrations, the NYPD should "utilize undercover officers to spread misinformation within the crowds [of demonstrators]," see Pl. 56.1 ¶ 80 (citing Graham Report) (alteration in original).

Assuming arguendo that such evidence would allow a reasonable jury to conclude that certain high-level officials harbored a desire to retaliate against plaintiffs for their protected First Amendment activities, it would be purely speculative for a jury to conclude that these officials caused a delay in plaintiffs' arraignments. The documents plaintiffs cite were not authored by any individuals identified as having responsibility for arraignments and plaintiffs have marshaled no evidence showing that any individual who actually had responsibility for processing the plaintiffs was potentially aware of the existence of these documents. A First Amendment retaliation requires evidence of the "actual mental state" of the defendants. See Kerman v. City of New York, 261 F.3d 229, 242 (2d Cir. 2001); see also Curley, 268 F.3d at 73 (requiring "[s]pecific proof of improper motivation") (citing Blue v. Koren, 72 F.3d 1075, 1082-83 (2d Cir. 1995)). No reasonable jury could use the evidence presented by plaintiffs to conclude that any

particular defendant delayed plaintiffs' arraignments because of plaintiffs' First Amendment activity.

Given the failure to show a constitutional violation, it is unnecessary to consider whether any of the defendants would be entitled to qualified immunity.

F. <u>State Law Claims</u>

1. <u>False Arrest</u>

Three plaintiffs have claimed false arrest under New York law.  <u>See</u> Third Am. Compl. ¶¶ 302-04; Pl. Mem. at 78.  As noted in Section II.B.1 above, "[t]he elements of false arrest . . . under § 1983 are 'substantially the same' as the elements under New York law."  <u>Boyd v. City of New York</u>, 336 F.3d 72, 75 (2d Cir. 2003) (citing <u>Hygh</u>, 961 F.2d at 366); <u>accord</u> <u>Weyant</u>, 101 F.3d at 852.  "Therefore, the analysis of the state and the federal claims is identical."  <u>See</u> <u>Boyd</u>, 336 F.3d at 75.  As discussed in Section II.B.3 above, the individual defendants have qualified immunity from the false arrest claims brought under 42 U.S.C. § 1983.  With respect to the state law claim, New York law provides qualified immunity to police officers under a standard similar to the federal qualified immunity standard.  <u>See</u>, <u>e.g.</u>, <u>Jones v. Parmley</u>, 465 F.3d 46, 63 (2d Cir. 2006) ("New York law . . . grants government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis."). As one court summarized it:

> "'A government official performing a discretionary function is entitled to qualified immunity provided his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'" (<u>Doyle v. Rondout Valley Cent. Sch. Dist.</u>, 3 A.D.3d 669, 670-71 [2004] quoting <u>Liu v. New York City Police Dept.</u>, 216 A.D.2d 67, 68 [1995], <u>lv. denied</u> 87 N.Y.2d 802 [1995], <u>cert. denied</u> 517 U.S. 1167 [1996]).  To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under

the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper (id. at 670).

Brown v. State, 12 Misc.3d 633, 648 (Ct. Cl. 2006); accord Hayes v. City of Amsterdam, 2 A.D.3d 1139, 1140 (3d Dep't 2003); Kravitz v. Police Dept. of Hudson, 285 A.D.2d 716, 717-18 (3d Dep't 2001).  Plaintiffs appear to argue that there is no immunity defense available under state law.  Pl. Mem. at 78.  The cases plaintiffs cite are inapplicable, however, as they state only that police officers are not entitled to absolute immunity in an arrest context.  See Peterson v. County of Nassau, 995 F. Supp. 305, 317-18 (E.D.N.Y. 1998) (police officers enjoy absolute immunity only when testifying as witnesses); Arteaga v. State, 72 N.Y.2d 212, 219 (1988) ("police officers . . . under established law are entitled only to qualified immunity").  For the reasons discussed in section II.B.3 above, the individual defendants are entitled to qualified immunity from the false arrest claims.

> 2.  Malicious Prosecution

Plaintiffs have withdrawn all state law malicious prosecution claims.  See Perez Decl. ¶ 9.[9]

> 3.  Assault and Battery

Plaintiff Supreme has claimed assault and battery under New York law.  See Third Am. Compl. ¶¶ 305-07; Pl. Mem. at 78.  Defendants argue that this claim is barred because of the

---

[9]Plaintiffs' memorandum of law seems to contradict this, as it states that only Mary Finelli and Vermin Love Supreme are withdrawing their state malicious prosecution claims.  See Pl. Mem. at 78.  The Court assumes that this is in error, and relies instead on the Perez declaration, which states that all three plaintiffs -- Finelli, Supreme, and Nancy Draper -- have withdrawn this claim. In any event, because the elements of a state law malicious prosecution claim mirror those of a federal claim, see, e.g., Martinez v. City of Schenectady, 97 N.Y.2d 78, 84 (2001), any state law malicious prosecution claims would have to be dismissed for the reasons stated in section II.C.

failure to file a timely Notice of Claim within 90 days of the alleged tort, pursuant to General Municipal Law § 50-e.  See Def. Mem. at 44-45; Def. 56.1 ¶ 55.  "[I]n a federal court, state notice-of-claim statutes apply to state-law claims."  Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir. 1999) (citing cases). While plaintiffs deny that the claim was untimely, Pl. 56.1 ¶55, they provide no admissible evidence in support of their contention as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).  Even when defendants pointed out this absence of proof, Def. Reply Mem. at 46, plaintiffs did not correct it.

Under § 50-i, "[n]o action . . . shall be prosecuted or maintained against a . . . county . . . for personal injury . . . alleged to have been sustained by reason of the negligence or wrongful act of such . . . county . . . or of any officer, agent or employee thereof, . . . unless . . . a notice of claim shall have been made and served upon the . . . county . . . in compliance with section fifty-e of this chapter."  Thus, any claim against the City must fail.

With respect to any claim against the individual defendants, Section 50-e(1)(b) states that "[i]f an action or special proceeding is commenced against [an officer, appointee or employee of a public corporation], but not against the public corporation, service of the notice of claim upon the public corporation shall be required only if the corporation has a statutory obligation to indemnify such person under this chapter or any other provision of law."  It is settled that "'[a] public corporation has a statutory obligation to indemnify if the officer, appointee or employee was acting within the scope of his or her employment in committing the alleged tortious acts.'" Houghton v. Cardone, 295 F. Supp. 2d 268, 280 (W.D.N.Y. 2003) (citing Smith v. Scott, 294 A.D.2d 11, 19 (2d Dep't 2002)).

Because "there is no suggestion in the complaint that any of the individual defendants were acting outside the scope of their employment when they performed the acts in question, . . . the notice of claim requirement applies to them as well." Houghton, 295 F. Supp. 2d at 280. Accordingly, the individual defendants are also entitled to summary judgment on this claim based on plaintiff's failure to comply with General Municipal Law § 50-e.

Conclusion

For the foregoing reasons, the case should proceed on plaintiffs' claims of excessive detention under the Fourth Amendment against defendants Devlin, Kuhn and Katz.[10]  All other claims should be dismissed.  Thus, defendants' motion for summary judgment (Docket # 144) should be granted in part and denied in part.  Plaintiffs' cross-motion for summary judgment (Docket # 132) should be denied.

**PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Kimba M. Wood and to the undersigned at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Wood.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140, 144-45 (1985).

---

[10]The Court's disposition of the claims against Captain Katz is without prejudice to any future application on the question of whether Captain Katz was properly served.  See Def. Mem. at 1 n.1.

Dated:          January 3, 2007
                New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Daniel M. Perez
Kuby & Perez
119 West 23rd Street, Suite 900
New York, NY  10011

Mark Zuckerman
Office of Corporation Counsel
100 Church Street
New York, NY  10007

Hon. Kimba M. Wood
United States District Judge

Dated:        January 3, 2007
              New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Daniel M. Perez
Kuby & Perez
119 West 23rd Street, Suite 900
New York, NY  10011

Mark Zuckerman
Office of Corporation Counsel
100 Church Street
New York, NY  10007

Hon. Kimba M. Wood
United States District Judge

47